UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| | CRIMINAL No. 24-cr-10001-LTS |
| v. | |
| AIZAVIER ROACHE | |
| Defendant | |

## SENTENCING MEMORANDUM OF THE UNITED STATES

The United States respectfully submits this Sentencing Memorandum in the above-captioned case, currently scheduled for sentencing on February 11, 2025. The Government suggests that a period of imprisonment of 70 months, followed by three years of supervised release is the appropriate sentence for this case. The Government recognizes that this places the recommendation at the high-end of the Guidelines as calculated by U.S. Probation in this case; however, the Government would note for the Court that based on its Guideline calculation, the above recommendation is below the bottom-end of their calculated range. Nevertheless, regardless of the ultimate Guideline calculation determined by the Court, the Government believes that their recommendation is the correct one, it is sufficient but not greater than necessary.

**I.    Procedural History**

On January 4, 2024, the defendant, Aizavier Roach, (hereafter "the defendant" or "ROACHE") was arrested and ordered detained in federal custody for the instant offense. ECF Nos. 1, 4 & 11. On Wednesday, October 30, 2024, the defendant pled guilty to a one count Indictment charging him with Trafficking in Firearms and Conspiracy to do so, in violation of 18

U.S.C. § 933(a)(1), (a)(3), and (b). ECF No. 58. There is no plea agreement between the Government and ROACHE in this matter.

ROACHE faces the following maximum penalties upon pleading to Count One of the Indictment: a sentence of up to 15 years of incarceration; supervised release for three years; a fine of $250,000; and a mandatory special assessment of $100.

## II.    Factual Background

On August 5, 2021, ATF Special Agents assigned in Columbia, South Carolina, interviewed Travon Brunson ("BRUNSON") regarding his suspected involvement in firearms trafficking from South Carolina to Massachusetts. During the consensual interview, BRUNSON admitted to purchasing twenty-four (24) firearms for an individual he knew as "Boston," who he later identified through a photo as ROACHE. BRUNSON explained that prior to purchasing firearms (for ROACHE), ROACHE would text him photos of the firearms he wanted. The two would then meet and ROACHE would provide BRUNSON with the cash to make the purchase(s).  BRUNSON would purchase the firearms and meet ROACHE at different locations to transfer the firearms. BRUNSON claimed to not know why ROACHE didn't purchase firearms for himself, but assumed he was a felon.

During a follow up interview with ATF Special Agents, BRUNSON asserted that he didn't make any money from purchasing the firearms for ROACHE, and stated he stopped buying for him once BRUNSON learned ROACHE was making extra money off them. BRUNSON did not know how frequently ROACHE traveled back to Boston but indicated ROACHE would occasionally say he was going home to see family and friends.  BRUNSON also explained that he knew ROACHE from working together at different jobs, dating back to

2010. Agents asked BRUNSON if he recalled the 4473 forms.  BRUNSON stated he did recall the forms and admitted he filled the form out himself on each purchase. Agents asked how BRUNSON answered the question asking if he was the actual purchaser of the firearm? BRUNSON said he just answered, 'yes,' and said he was the purchaser.  At the end of the interview, agents reminded BRUNSON that buying a gun for someone else is a federal crime and that ROACHE was a felon, with some instances of violence in his history, and his possession of any firearms is unlawful.

BRUNSON'S 2023 FIREARM PURCHASES

In September 2023, the ATF became aware that BRUNSON purchased four (4) firearms of the same make, model, and caliber in South Carolina on April 25, 2023.  Since that time, three (3) of those firearms have been recovered in Boston, MA on individuals without pistol permits. One of the firearms purchased on that date was preliminarily linked through NIBIN to a non-fatal shooting in Boston just 15 days after its purchase. That shooting resulted in two victims sustaining gunshot wounds. The male victim sustained gunshot wounds to his chest, ankle, and hip. The female victim sustained a gunshot wound to the right arm. *See* Attachment C to the Government's Sentencing Memorandum.

That same firearm was ultimately recovered by law enforcement just 41 days after the purchase, (26 days after the shooting) on an individual without a valid MA pistol permit, who was gang affiliated.  Additionally, one of the four firearms from April 25th was recovered in a juvenile's vehicle on August 30, 2023 (127 days after its purchase), one on an individual without a valid MA pistol permit on August 26, 2023 (123 days after its purchase), and another on an individual without valid MA pistol permit on June 20, 2023 (56 days after purchase).  As of the date this case was charged, eleven (11) firearms purchased by BRUNSON in South Carolina

since 2020 have been recovered in Massachusetts. *See* Attachments D, E, and F to the Government's Sentencing Memorandum.

Suspecting that BRUNSON was again engaged in straw purchasing and trafficking firearms, agents contacted Academy Sports and Outdoors, located in Columbia, SC, (the store where BRUNSON purchased the four (4) firearms on April 25, 2023) and requested the associated ATF Form 4473s, as well as records for any other purchases BRUNSON made since August 2021. After receiving the requested forms, agents reviewed and confirmed BRUNSON was the purchaser and that he answered question "21a.", "yes," certifying that BRUNSON was the actual transferee/purchaser of the firearms. Agents learned that in addition to the four (4) firearms purchased in April, BRUNSON purchased an additional firearm (that has not been recovered) in February 2023. In addition, agents learned that BRUNSON purchased yet another firearm on January 19, 2023, from Sportsman's Warehouse, in Columbia, SC. Based in part on ATF Form 4473s records received from various FFLs in the Columbia, SC, area, BRUNSON purchased at least forty-six (46) firearms in South Carolina since May 2020.

During the course of this investigation, agents requested and received records associated with both ROACHE and BRUNSON pursuant to Grand Jury subpoenas from Block Inc. aka Cash App, Varo Bank, Sutton Bank, T-Mobile, and other companies. These records received included specific information linking both BRUNSON and ROACHE to their respective accounts. In addition, on November 16, 2023, a phone was seized from ROACHE incident to his arrest by the Boston Police Department; on a separate matter. That phone was later searched pursuant to a District of Massachusetts search warrant (23-mj-6547-MPK). Agents reviewed these records, which revealed, along with records received from various FFLs and the forensic

analysis of ROACHE's cellphone and that BRUNSON purchased firearms for ROACHE on January 19, 2023, February 2, 2023, and April 25, 2023.

JANUARY 19, 2023, PURCHASE

According to the Form 4473 and sales receipt obtained from Sportsman's Warehouse, located in Columbia, SC, agents learned that on January 19, 2023, BRUNSON purchased a single firearm from their store.

A review of the numerous text message exchanges and phone calls between ROACHE and BRUNSON during and around the day of January 19, 2023, revealed that the two discussed the price of different firearms at length before ultimately settling on BRUNSON purchasing a Glock model 21 firearm from Sportsman's Warehouse for $570 (plus tax) for ROACHE.

In addition, on the same day, BRUNSON sent ROACHE a photo containing a QR code for his Cash App account. A few minutes later, ROACHE advised that he sent $675 to BRUNSON for the purchase of the firearm. The corresponding CashApp transfer from ROACHE to BRUNSON, puts ROACHE in Boston through geolocation data during the transaction. After telling ROACHE that he purchased the firearm, ROACHE thanked him and asked that he hold on to it for him.

FEBRUARY 2, 2023, PURCHASE

On February 2, 2023, BRUNSON purchased a single firearm from Academy Sports & Outdoors, located in Columbia, SC.  A review of the numerous text message exchanges and phone calls between ROACHE and BRUNSON during and around the day of February 2, 2023, revealed that they discussed the price of different firearms at length before ultimately settling on BRUNSON purchasing a Glock, model 22 firearm from Academy Sports and Outdoors, on sale for $529 for ROACHE.

ROACHE sent $570 to BRUNSON for the purchase of the firearm using CashApp. The corresponding CashApp transfer from ROACHE to BRUNSON, puts ROACHE in Boston through geolocation data during the transaction. In addition, on February 3rd, ROACHE texted "it's cold as hell up here" and included a screen capture showing it to be 13 degrees in "Boston."

After this purchase in February, ROACHE traveled to South Carolina from Massachusetts to pick up the firearm or firearms. ROACHE's phone indicated that he booked a ticket to fly to Charlotte, NC on February 10, 2023 (with a connecting flight in Washington DC on Feb 11th). Specifically, messages from United Airlines on ROACHE's phone, show "check in" reminders from United Airlines for his flight to Charlotte, NC (approximately an hour and a half from Colombia, SC), with a connecting flight in Washington DC. In addition, he sent his sister a text message on February 11th letting her know that he was is in South Carolina. There are also text messages between ROACHE and "PandaNYBus" indicating that ROACHE scheduled a bus ticket for his return on February 11th for 8:30 PM. Earlier on the same day, ROACHE texted a contact requesting $70 for a bus ticket. In addition, ROACHE's Varo Bank records show transactions that posted the following day with "Panda NY Bus" and "Adirondack Transit Line".

BRUNSON stored the firearms he purchased for ROACHE on January 19th and February 2nd until ROACHE was able to take subsequent possession of them on February 11th. ROACHE's text message from January 19th indicates as much when he texts BRUNSON to purchase the firearm and then hold it for him.

APRIL 25, 2023, PURCHASE

On April 25, 2023, BRUNSON purchased four Taurus, PT111 G2A, 9mm pistols from Academy Sports & Outdoors, located in Columbia, SC. A review of the numerous text message

exchanges and phone calls between ROACHE and BRUNSON during and around the day of April 25, 2023, indicated that ROACHE was in South Carolina at the time BRUNSON purchased the four (4) firearms and that the two spent time together the day of and day before the purchase on April 25, 2023.

On the day of the purchase, ROACHE texted BRUNSON, "My PIN number is 2580". Based on evidence collected in this case including the associated sales receipt, BRUNSON purchased the firearms approximately forty minutes after receiving that text message. ROACHE's card was used to complete the transaction and ROACHE texted BRUNSON the pin number to the same card to facilitate this sale.

A review of the video's located on ROACHE's phone revealed a video dated April 25, 2023, 8:42 PM, which shows what appears to be a black male's hand reaching into a compartment located on the back of some sort of seat, moving around what appear to be multiple handguns, some of which are in plastic. The bottom of two of the suspected firearms are visible, which are black in color and consistent with that of a handgun's grip and magazine well. The pattern seen on the grip is consistent with that of a Taurus G2C firearm (which is the type of firearm purchased by BRUNSON earlier that day).



As previously noted, three of the four firearms purchased in April 2023 have been recovered in Boston, MA, in the possession of individuals who could not lawfully possess them. *See* ¶13.

Agents located an admission from ROACHE during a review of text messages on his phone on October 25, 2023. During a back and forth between ROACHE and another individual, ROACHE texted "I just have to Mia" then "Back to spellings guns and doing my thing". Agents believed, that ROACHE intended to text "Back to selling guns and doing my thing".

DISCUSSIONS OF OBLITERATING SERIAL NUMBERS AND PROFITS

A review of the numerous text message exchanges between ROACHE and BRUNSON revealed their intention to obliterate the serial numbers on the aforementioned firearms purchased in April. BRUNSON also discusses the "cut" he will receive from ROACHE's subsequent sale of the firearm.

In those text messages BRUNSON reminded ROACHE to pay him his "cut" of $300 like he had done before in February ROACHE then text messages BRUNSON that he's going to "scratch these shit off" (referring to the firearm's serial numbers), to which BRUNSON told him to "make sure dey unrecognizable", which demonstrates BRUNSON's awareness that the serial numbers would link the firearms back to him should they be recovered. The two continue to talk about potential earnings for flipping the firearms as BRUNSON advised that he could earn approximately $3,500.00. ROACHE then indicated that he was getting his cut from another co-conspirator, "I was just transporting and getting a cut from him".

MORE RECENT DISCUSSIONS OF POTENTIAL FIREARMS TRAFFICKING

A review of text messages between BRUNSON and ROACHE revealed that on October 26, 2023, ROACHE advised BRUNSON of a "gun show" that was coming in November.

ROACHE was alerting BRUNSON of a gun show that was scheduled to take place at the Jamil Shrine Temple, located in Columbia, SC on November 11th & 12th, 2023.  He also advises BRUNSON that he wants a "Mac", referring to a Military Armament Corporation (Mac) model firearm.

NARCOTICS DEALING

On October 12, 2023, ROACHE was issued a court summons by the Boston Police Department for 94C/32A/G-1 – Possession with intent to distribute a Class B narcotic, after a pat frisk of his person yielded a plastic bag containing a rock-like substance believed to be crack-cocaine in his pocket.  During a subsequent search of his vehicle, a digital scale believed by officers to be used for weighing drugs for distribution, was located, and seized.

During a review of ROACHE's phone, agents also observed conversations regarding his suspected distribution of narcotics in both Massachusetts and South Carolina. As an example, in a conversation between ROACHE and another individual believed to be living  in South Carolina, the two discuss the sale of crack-cocaine.  Specifically, while texting with this person on August 18, 2023, ROACHE texted, "I'm out here selling crack".  ROACHE then sent the following photo of three plastic bags containing what appears to be based on agents training and experience crack-cocaine, near a digital scale.



ROACHE also sent a video of what agents believed based on training and experience, to be of an individual manufacturing crack-cocaine, also with a digital scale close-by.  Below is a screenshot of the video:



ROACHE continued to discuss the narcotics with this individual, sending texts such as, "Im out here bout to get us rich bro" and "I know how to cook it up now".

CONDUCT WHILE IN CUSTODY

While in custody ROACHE was disciplined for his role in possessing, and based on the facts as presented, likely distributing contraband drugs while in custody pending resolution on this case. In addition, he was written up for assaulting another detainee whom he perceived as a "rat" or a snitch. *See* Presentence Investigation Report (hereafter "PSR") ¶ 5 and Attachments A & B to the Government's Sentencing Memorandum.

Specifically, on Thursday, August 29, 2024, officers at the Wyatt Correctional Facility completed an unclothed search of Detainee ROACHE and discovered a small balloon made from a blue glove and a bundle of paper wrapped in plastic wrap inside. Officers believing this to be contraband, specifically marijuana, tested the material inside. The results of the test were positive for THC. ROACHE and the other responsible detainee were given urinalysis tests. ROACHE's came back negative, while the other detainee's test came back positive for THC/marijuana.

ROACHE admitted to ownership of the marijuana. When asked for a statement, ROACHE made no comment other than to say, "When will I see the d-board?". *See* Attachment A to the Government's Sentencing Memorandum.

This incident in August while in custody occurred just two months after ROACHE was already cited for taking part in a group assault on another detainee, whom they believed to a cooperating with the Government. When questioned by officers about this incident, ROACHE described the victim as a "Decepticon" and "gangsta gone bad". He appeared to exhibit no remorse for his actions or concern for the victim. *See* Attachment B to the Government's Sentencing Memorandum.

## III.    Legal Framework

The United States Sentencing Guidelines ("Guidelines") are "the starting point and the initial benchmark" in sentencing. Gall v. United States, 552 U.S. 38, 49-50 (2007). Following the Supreme Court's decision in Gall v. United States, "District Court judges can choose sentences that differ from the Sentencing Commission's recommendations—provided of course that they stay within the range set by the statutes of conviction and consider the sentencing factors arrayed in § 3553(a)." *See e.g.*, Gall, 552 U.S. at 41, 49–50 & n. 6. While Gall made the Guidelines advisory, "[t]his is not a blank check for arbitrary sentencing." *Id.* "Judges *still* must start out by calculating the proper Guidelines range—a step so critical that a calculation error will usually require resentencing." *Id.* "The reason for this is simple. Congress wants judges to do their best to sentence similar defendants similarly." *See* Booker, 543 U.S. at 250–54, 259–60. "And starting with the Guidelines' framework—which gives judges an idea of the sentences imposed on equivalent offenders elsewhere—helps promote uniformity and fairness." *See* Gall, 552 U.S. at 49; Booker, 543 U.S. at 245–60.

After consulting the Guidelines, the Court must craft a sentence that sufficiently accounts for the sentencing factors and objectives outlined in 18 U.S.C. § 3553(a). *See* Gall, 552 U.S. at 50. In doing so, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. *See* 18 U.S.C. § 3553(a). The Court must consider the nature and circumstances of the offense and the history and characteristics of the defendant; must impose a sentence that sufficiently reflects the seriousness of the crime, promotes respect for the law, and provides just punishment, and the sentence should adequately deter criminal conduct, protect the public, and provide any necessary education, training or treatment. *See* 18 U.S.C. §§ 3553(a)(2)(A)-(D). The Court must also strive to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct. *See* 18 U.S.C. § 3553(a)(6). After determining the appropriate sentence, the Court should adequately explain its rationale to "allow for meaningful appellate review and to promote the perception of fair sentencing." *See* Gall, 552 U.S. at 50. [1]

"Variances are 'non-Guidelines sentences that result from the sentencing judge's consideration of factors under 18 U.S.C. § 3553(a),' while departures are a term of art referring to non-Guidelines sentences authorized and 'imposed under the framework set out in the Guidelines.'" *See* United States v. Tirado-Nieves, 982 F.3d 1 (1st Cir. 2020) (quoting Irizarry, 553 U.S. at 714); United States v. Adorno-Molina, 774 F.3d 116 (1st Cir. 2014). After the guideline range is determined, the court may "depart" from the guideline range where "there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken

---

[1] "In reviewing a sentence for reasonableness, the Court of Appeals first examine whether, in arriving at sentence, the district court committed any procedural errors, such as failing to calculate, or improperly calculating, the advisory Guidelines range, treating the Guidelines as mandatory, failing to consider the statutory sentencing factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence, including any deviation from the Guidelines range" *See* United States v. Contreras-Delgado, 913 F.3d 232 (1st Cir. 2019).

into consideration by the Sentencing Commission." *See* <u>Pepper v. United States</u>, 562 U.S. 476, 494 (2011). "If the court departs from the applicable guideline range, it shall state, its specific reasons for departure in open court at the time of sentencing and…shall state those reasons with specificity in the statement of reasons form." *See* 18 U.S.C. § 3553(c).

## IV.    Sentencing Guidelines Calculations

The Defendant faces a statutory maximum sentence of 15 years imprisonment on the one count Indictment charging him with Trafficking in Firearms and Conspiracy to do so, in violation of 18 U.S.C. § 933(a)(1), (a)(3), and (b).  *See* PSR cover sheet and ¶ 107.

The Government agrees with the following aspects of the guideline analysis as determined by U.S. Probation in the PSR. The Defendant's base offense level is 14 (§2K2.1(a)(5)(A)); the defendant's offense level is increased by 6 because the offense involved 25 firearms but less than 99 firearms (§2K2.1(b)(1)(C)); the defendant's offense level is increased by 4 because the offense involved the trafficking in firearms (§2K2.1(b)(5)); and the Defendant's offense level is decreased by 3 levels because the defendant has accepted responsibility for his crimes. *See* PSR ¶¶ 37, 38, 39, 46, and 47.

### A.  Offense Level Computation

### ¶ 37 – Base Offense Level

The Base Offense Level: **<u>14</u>**

### ¶¶ 38 & 39 – Specific Offense Characteristics

The Base Offense Level is increased by **<u>6-levels</u>** because pursuant to §2K2.1(b)(1)(A), the offense involved 25 firearms but less than 99. In this case, in August 2021, Brunson admitted to purchasing 24 firearms for the defendant. During the Indictment period for the instant offense, Brunson purchased at least six firearms for the defendant.

The Base Offense Level is increased by **4-levels** because pursuant to §2K2.1(b)(5), the defendant engaged in the trafficking of firearms. In this case, the defendant, who could not lawfully possess a firearm, induced co-defendant BRUNSON to purchase firearms that he then unlawfully resold firearms to individuals in Massachusetts who did not have valid firearm permits. The recovery of multiple firearms on persons without permits and the defendant's conversations with BRUNSON about the need to obliterate serial numbers, demonstrates that he did so knowingly.

### ¶ 24 – Adjusted Offense Level

The Adjusted Offense Level is therefore: **24**.

### ¶¶ 46 - 48 – Total Offense Level

With prompt acceptance of responsibility, the defendant's offense level is therefore decreased by 3 – levels, which brings the Total Offense Level is **21** as calculated by U.S. Probation.

The Government diverges from U.S. Probation and the defendant over one of the enhancements under § 2K2.1(b)(6)(B), which states in relevant part that:

> If the defendant used or possessed any firearm or ammunition in connection with another felony offense; or possessed or transferred any firearm or ammunition with knowledge, intent, or reason to believe it would be used or possessed in connection with another felony offense, increase by **4** level.

The Government contends that § 2K2.1(b)(6), which provides for a 4-level increase, with a minimum offense level of 18, should be applied in this instance. In this case the defendant, ROACHE used, possessed, or transferred a firearm in connection with another felony offense: to facilitate a threat, in conjunction with narcotics activity, to facilitate illegal firearm possession, and providing a firearm used in a shooting. ROACHE possessed and transferred firearms with the knowledge, that they would be used by other prohibited people in connection with other

felony offenses; in fact, the Government would suggest that this was the very reason his firearms trafficking enterprise existed. *See* USSG §2K2.1(b)(6).

The guidelines define "[A]nother felony offense," in §2K2.1(b)(6)(B) to mean "any federal, state, or local offense, other than the explosive or firearms possession or trafficking offense, punishable by imprisonment for a term exceeding one year, regardless of whether a criminal charge was brought, or a conviction obtained." *See also, e.g*; United States v. Anderson, 62 F.4th 1260, 1269–70 (10th Cir. 2023) (district court appropriately applied the enhancement where, although the state charge was dismissed, the Government presented sufficient evidence to determine by a preponderance of the evidence that the defendant committed the offense. However, importantly § 2K2.1(b)(6)(B) applies if the firearm or ammunition "facilitated, or had the potential of facilitating," another felony offense. *See also* United States v. Bishoff, 58 F.4th 18, 24 (1st Cir.) (defendant sold unserialized firearms to an undercover officer and discussed drug during a sale "create[ing] a reasonable inference that the desire to purchase the custom, untraceable weapons . . . stemmed from a desire to use them to unlawful ends"), cert. denied, 143 S. Ct. 2481 (2023); United States v. Sanchez, 22 F.4th 940, 942 (10th Cir. 2022) (firearm had the potential to facilitate possession of a stolen vehicle where it "emboldened [the d]efendant to accept th[e] enhanced risk" that someone would "recognize the vehicle was stolen").

The Commission has clarified that §2K2.1(b)(6)(B) applies so long as the other offense was relevant conduct to the firearms offense, whether or not the offenses would group under §3D1.2. Application Note 14(B) to §2K2.1 provides further guidance regarding the "in connection with" requirement when the other offense is burglary or a drug trafficking offense. When the other offense is a drug trafficking offense, the enhancement applies if "a firearm is found in close proximity to drugs, drug-manufacturing materials, or drug paraphernalia. *See, e.g.,*

15

United States v. Tirado-Nieves, 982 F.3d 1, 10–11 (1st Cir. 2020) (affirming enhancement based on the court's determination that the defendant "unlawfully possessed drug paraphernalia in a quantity that was indicative of drug trafficking").

Courts have differed in whether they find proximity alone to be sufficient in these cases and in the degree of fact required to find a nexus between the drugs and the firearm. The Sixth Circuit has applied §2K2.1(b)(6)(B) on the "fortress theory"—the presumption that firearms found in close proximity to drugs on premises controlled by the defendant and in his possession are for use in protecting the drugs or facilitating a drug transaction. *See* United States v. Jackson, 877 F.3d 231, 239 (6th Cir. 2017). In applying this theory, the Sixth Circuit has considered the proximity of the firearm to the drugs, whether there was an innocent explanation for the presence of the weapon (including personal protection), the type of firearm, whether the firearm was loaded, the accessibility of the firearm, and the amount of drugs in proximity to the firearm. *See* United States v. Shanklin, 924 F.3d 905, 920 (6th Cir. 2019)

Nevertheless, in this case the Government asserts that case law supports its' calculation of the guidelines and the addition of this enhancement. "It is elementary that 'the Government bears the burden of proving sentence-enhancing factors by a preponderance of the evidence.'" *See* United States v. Nuñez, 852 F.3d 141, 144 (1st Cir. 2017). "The preponderance-of-the-evidence standard 'is a more-likely-than-not rule.'" *See, e.g.*, United States v. Mulkern, 854 F.3d 87, 90 (1st Cir. 2017).

In United States v. Rogers, the First Circuit upheld a felon in possession sentence with the 2k2.1(b)(6)(B) enhancement for procedural reasonableness where "the Probation officer determined that a preponderance of the evidence demonstrated that Rogers had committed the offense of Terrorizing With A Dangerous Weapon in violation of Maine law." 17 F.4th 229, 223

16

(1st Cir. 2021). The defendant in that case sent several videos to other individuals and made several Facebook posts with a gun visible in a threatening manner. *Id.* at 232. Here ROACHE admits to threatening another person with a gun during a heated conversation with a contact of his in messages taken from a forensic extraction of his phone. *See* PSR ¶ 32a. The Court in Rogers cites United States v. Matthews, in its support that "Either direct or circumstantial evidence will do, with the sentencing court free to draw commonsense inferences from the evidence." 49 F.3d 99, 105 (1st Cir. 2014). The Court here can draw the inference from the "Factual Background" section of this memorandum and in reviewing the PSR that ROACHE had reason to believe that his conduct – acquiring and transferring firearms to other individuals – would be used to commit other felony offenses. *See* PSR ¶¶ 8-32a and Attachments C, D, E, and F to the Government's Sentencing Memorandum.

 In United States v. Chanthachack, the First Circuit upheld application of the enhancement in an unpublished opinion where "the defendant had reason to believe that the CW [whom he sold the gun to] was engaged in drug trafficking." 483 Fed. Appx. 580, 581 (1st Cir. 2014). The Court in Chanthachack, "held that, as used in this provision of the Guidelines, 'the phrase "in connection with" should be interpreted broadly." *Id.* The Court further stated, "We read the guideline through the prism of Application Note 14." United States v. Paneto, 661 F.3d 709, 717 (1st Cir.2011). The application note was adopted in 2006, and "sheds a bright light on the scope of the phrase 'in connection with' and confirms that the guideline applies when the firearm 'facilitate[s], or ha [s] the potential of facilitating, another felony offense.' U.S.S.G. § 2K2.1, comment. (n. 14(A))." *Id.*

 Commonsense would suggest that ROACHE provided firearms to those who couldn't legally purchase them through other means and given the ultimate purpose of a firearm, it is

certainly reasonable to believe that he knew those firearms would end up as part of additional felonious conduct. The Fifth circuit precedent has held that "the plain language of the guideline dictates that the Government need not prove that the firearm was actually used in a specific other felony offense; it is enough that a defendant had reason to believe that it would be." United States v. Caldwell, 448 F.3d 287, 291 (5th Cir. 2006). However, in this case with ROACHE, we have specific information that the firearms purchased by BRUNSON and then provided to ROACHE were ultimately recovered and/or used in Massachusetts.  See PSR ¶¶ 8-32a, Attachments C, D, E, and F to the Government's Sentencing Memorandum.

Similarly, the Fifth Circuit also affirmed in United States v. Juarez that the district court could reasonably infer from all of the circumstances surrounding the defendant's purchases that she transferred at least one of those twenty-five weapons with a 'reason to believe' that it would be illegally used in another felony. 626 F.3d 246, 250 (5th Cir. 2010). The Government would argue that the Court here can also reasonably infer from ROACHE's conduct that he knew at least one of his firearms would be used for another felony.

Furthermore, the court in Juarez also clarified that the version of the Guideline applicable in their case (*and the language is functionally the same in this case*) defines "another felony offense" as "any federal, state, or local offense, other than the explosive or firearms possession or trafficking offense." *Id.* at 255. If the Court here were to credit the interpretation of the Juarez court in their reading of this Guideline, then the fact that ROACHE illegally transferred any firearm, to any prohibited individual, then it would constitute another felony and trigger the enhancement.

In addition, looking at a different set of facts but through a similar lens, ROACHE's illicit narcotics business, which is referenced in the PSR, would also trigger this enhancement by

virtue of the fact that there is an inference in the facts before the Court that ROACHE possessed illegal firearms, purchased by BRUNSON, and did so at the same time he was conducting his narcotics business. *See* ¶¶ 29-32. In United States v. Reyes-Torres, 979 F.3d 1(1st Cir. 2020), the enhancement was applied because the defendant possessed a firearm in connection with the unlawful possession of a controlled substance. The court noted that the presence of the firearm had the potential to facilitate the felony offense, consistent with the guidelines' commentary.

### *Revised Total Offense Level*

If the Court were to agree with the Government regarding the enhancement under §2K2.1(b)(6)(B), then an additional 4 level increase would be added to the Offense Level, bringing the revised Total Offense Level to **25**.


## V.    Sentencing Recommendation

The Government's recommended sentence – including the 70 months of incarceration – is the reasonable and just outcome in a case, especially where the Guidelines appropriately take into account the nature, scope, and breadth of the defendant's criminal conduct. The Government's recommendation is the product of an enormous amount of thought and consideration, and its request of the Court – to apply the significant sentence here despite the calculable criminal history for this defendant – trusting that the Government's recommendation is made with the deliberation that such a request while not unusual in anyway is nevertheless a substantial request. That said, the Government submits that the defendant's criminal conduct, and the harm and the impact of his crime is adequately captured by the statutory guidelines as calculated by the Government, and appropriately commensurate with the true nature of his crimes. As such while this case calls out for a guidelines sentence; albeit one slightly below the bottom of the range as calculated by the Government, nevertheless one that is fitting of the defendant's actions. Pursuant to 18 U.S.C. § 3553(a), the

Court is required to consider a series of factors when determining an appropriate sentence. These factors include "the nature and circumstances of the offense and the history and characteristics of the defendant"; the four legitimate purposes of sentencing; "the kinds of sentences available"; the Guidelines range itself; any relevant policy statements by the Sentencing Commission; "the need to avoid unwarranted sentence disparities among defendants"; and "the need to provide restitution to any victims." 18 U.S.C. § 3553(a).

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. Section 3553(a) also mandates that the sentence reflect the seriousness of the offense to, among other things, promote respect for the law, provide just punishment, adequately deter criminal conduct, and protect the public from further crimes of the defendant. Here, virtually every consideration enumerated in § 3553(a) weighs in favor of not just a guidelines sentence but even potentially a longer sentence.

## VI.    Discussion of § 3553(a) Factors:

Regardless of whether the Court is inclined to accept both the parties' and U.S. Probation's proffered guideline calculation, a sentence of 70 months for the defendant is "sufficient but not greater than necessary." *See* <u>United States v. Gall</u>, 552 U.S. 38, 44 (2007). Such a recommendation is bolstered by the considerations laid out in § 3553(a) including the nature and circumstances of the offenses, the history and characteristics of the defendant, the seriousness of the offenses, promoting respect for the law, providing just punishment for the offenses, the need to deter the defendant and others, the need to protect the public from the defendant's crimes, and the need to avoid unwarranted sentencing disparities. *See* § 3553.

Regardless of the sentencing guideline calculation accepted by this court, there are appropriate grounds for a finding of a variance or upward departure from the sentencing

guidelines. First, the below analysis of the factors enumerated in § 3553 explain why a variance is appropriate here. *See* <u>Tirado-Nieves</u>, 982 F.3d 1 (explaining that variances are "non-Guidelines sentences that result from the sentencing judge's consideration of factors under 18 U.S.C. § 3553(a)"). Second, there are "aggravating" circumstance of a kind, or to a degree, that are not satisfactorily covered by the Sentencing Commission in calculating the offense level but should be in the calculus of consideration in looking at a sentence here – these are typically used to justify an upward departure from the guidelines. Here the Government believes they should be used as additional credence for the recommended sentenced of 70 months of incarceration. The following characteristics of the defendant and of this case render the possible justifications listed in §5K2.6 and §5K2.9 (*Policy Statements*) are highly relevant in this case and the Government would suggest they be considered for guidance in determining a fair sentence. The defendant ultimately facilitated the substantial risk of death or serious bodily injury to multiple individuals. Specifically, four recovered firearms were found on individuals without valid Massachusetts pistol permits. One of the firearms was used in a non-fatal shooting where two victims sustained gunshot wounds. The use of a weapon or dangerous instrumentality here, "the discharge of a firearm might warrant a substantial sentence increase". *See* §5K2.6.

In addition, the defendant committed the offense to facilitate his continued criminal livelihood, he diversified his trafficking portfolio by selling drugs and firearms to the detriment of our communities – as such the defendant may receive additional scrutiny and support for a guidelines sentence that reflects the actual seriousness of the crime. *See* §5K2.9.  Here, the defendant's conduct triggered both of these adverse sentencing guidelines policy considerations, when he knowingly purchased and sold multiple firearms as a prohibited person to other presumably prohibited persons who used those firearms to commit crimes. At the time ROACHE

was charged in this case at least eleven of the dozens of firearms purchased by BRUNSON and provided to ROACHE for resale, were recovered by law enforcement as crime guns. *See* PSR ¶ ¶ 9 & 11.

### A. The Nature and Circumstances of the Offense Warrant a Sentence Above the Guidelines

The Government asserts that the unchallenged factual information contained in the PSR demonstrates that the nature of the offense and firmly supports a sentence of 70 months. The defendant in this case persistently sought to circumvent firearm laws and regulations and other similarly situated individuals in obtaining firearms, knowing that it was clearly illegal for him to possess them, let alone sell them to others.

Still worse the Government would suggest that the defendant was not amassing these firearms to horde them but rather the use them for collateral criminal conduct whether his own or others; the purpose of a firearm is to inflict serious bodily injury or death. The defendant knew or at the very least should have known that his conduct would ultimately risk public safety and harm others. One can infer that the defendant didn't amass several deadly weapons, especially of often of the same make and model, without consideration of the collateral use and their ultimate end use; whether at his hands or in the hands of another. Indeed, we know that one of the firearms purchased by ROACHE was linked through NIBIN to a non-fatal shooting in Boston just 15 days after its purchase in South Carolina. That shooting resulted in two victims sustaining gunshot wounds. The male victim sustained gunshot wounds to his chest, ankle, and hip. The female victim sustained a gunshot wound to the right arm. *See* PSR ¶ 11 and Attachment C to the Government's Sentencing Memorandum.

Here, despite the relevant statute being applied, the criminal law in this instance doesn't fully account for the impact of the defendant's conduct or capture the danger and risk to the public that results from the defendant's crime. The notion that firearms trafficking is a victimless crime, one that merely entails the illegal sale and purchase of firearms, waters down the fact the potential impact that each illegal gun has as it finds its ways to our communities. Indeed, it is impossible to overstate the impact that illegal firearms have in the hands of those willing to use them. The defendant conspired with and another individual who was able to purchase and possess firearms in an effort to deceive a process that was designed to keep deadly weapons out the hands of people like the defendant and the very people he associates with and transferred firearms to; dangerous individuals, people who are willing to use them and use them for violence. An inference can be drawn based on the captured communications between the conspirators in this case, along with the evidence collected that the defendant was not involved in mere illegal possession of this illicit arsenal but in additional dissemination and/or use. Evidence of this and ROACHE's knowledge of their potential subsequent use can be seen when ROACHE texts BRUNSON that he was going to scratch the serial numbers of the firearms. *See* PSR ¶ 27.

Again, the sentencing guidelines and the criminal law do not imagine in their calculus that the conduct of the defendant had any victim impact in this case. While there is no disputing that the conduct in this case lacks any direct victim involvement, to leave it there also fails to capture the clear and present danger and realized risk to the public that resulted from the defendant's crime. Indeed, it is impossible to overstate the impact that illegal firearms have in the hands of those willing to use them. The defendant here makes that point crystal clear in a text exchange with a contact in which he brags about using a firearm to threaten someone and inflict fear. *See* ¶ 32a. The defendant makes this point even clearer in the numerous firearms recovered

23

by law enforcement in Massachusetts at crimes scenes and on prohibited individuals because of his crimes. *See* ¶ ¶ 11 & 12.

The Government would suggest that there is ample evidence that the defendant was engaged beyond the events of this case, not in a singular departure from our societal norms but in a pattern of criminal conduct that extended beyond the sale of a few firearms or even multiple firearms, but to the sale of another blight in our communities, illicit drugs. Alarmingly, the defendant exhibits a similar disregard here for human life and the safety of our communities in exchange for his own personal and financial gain that he does with his firearms business. Boasting to others in Massachusetts and South Carolina about his burgeoning crack business. *See PSR* ¶ ¶ 30 – 32. Even while in the confines of a federal detention facility he was caught engaging in both violent conduct and illicit drug activity. *See* ¶ 5 and Attachments A and B to the Government's Sentencing Memorandum.

In light of the collateral additional safety risk caused by the defendant's criminal behavior, combined with his deeply concerning collateral and post arrest behavior, a sentence of 70 months would provide just punishment for the impact he had on the safety of his community and the lives of those around him.

### B. Specific and General Deterrence

The Court also must consider the need for the sentence to afford adequate deterrence to criminal conduct. 18 U.S.C. § 3553(a)(2)(B). Here, the Court must be concerned with both specific and general deterrence.

First, a 70-month sentence is necessary to deter the defendant from reoffending upon his release from custody. This is not a case in which the defendant committed one bad act or where he happened to be caught crossing the line on his worst day. This case did not involve a mistake

or momentary lapse in judgment. Rather, the defendant has a long and continuous history of engaging in criminal conduct going back to his being a teenager and leading to the present, including during his current carceral stint. *See* ¶¶ 5 & 51 – 70. The defendant engaged in a directed course of conduct, one in which he perpetrated many times during his continuous illegal business relationship with another individual, who had been informed about the firearms being sold to ROACHE were ending up in Massachusetts as crime guns. The defendant purchased and re-sold multiple firearms to individuals he knew or should have known were willing to use those weapons to hurt or kill others; destroying the fabric of other not so distant communities as a consequence.

Here, the sizeable sentence of 70 months sends the message to this particular defendant that he will face serious consequences if he continues to commit offenses that put the public at risk in order for him to financially benefit. Despite his numerous run-ins with state law enforcement in multiple states, the defendant has not been dissuaded from committing similar crimes. *See* PSR ¶¶ 51 – 70. A sizable period of incarceration in federal prison will likely make it clear to the defendant that such behavior will not be tolerated.

An equally important consideration here is general deterrence. Across the board, this sentence will demonstrate to similarly situated individuals that those who profit off the misery of others or financially gain from sending tools of destruction into our neighborhoods, will face a substantial period of incarceration.

In this case, and as discussed throughout this memo, a Guidelines sentence although not insignificant here would send the correct signal to others, imbued with the same hubris, lack of respect for others, and self-centered tendencies that there is no avoiding the serious consequences of conduct like that perpetrated by this defendant or they too will face significant imprisonment.

A sentence of 70 months would not only provide just punishment in the form of deterrence for this defendant, but it would also serve to deter others using their position of trust to violate the law and disillusion them from the false belief that providing illegal firearms is in anyway a worthwhile endeavor for them; the consequences will meet their conduct.

### C.  History and Characteristics

This defendant's history and characteristics also weigh in favor of a longer incarcerative sentence. *See* 18 U.S.C. § 3553(a)(1). The Government asserts that the defendant's history and characteristics weigh in favor of the sentence requested by the United States. The defendant's criminal and personal history documented in the PSR for this defendant is concerning both because of what it says but also rather for what is noticeably absent.

The defendant although a child of separation and an absentee biological father was raised in home with his mother and both his maternal grandparents; a home in which he appears by his own statements to have been loved and supported. The defendant never endured physical , sexual, or verbal abuse, nor any substance abuse.  *See:* PSR ¶¶ 73 – 77.  Thus, his concerning behavior demonstrates that despite the support and love around him, he has chosen to engage in this behavior; without a significant period of incarceration for the consequences of these choices to correct this behavior, the Government struggles to find a clear environmental trigger or underlying issue here to remedy by means other than incarceration. The defendant contends that the loss of his grandmother to cancer when he was 10 years old, whom he was very close with, was a point of demarcation for him. He contends that were his grandmother still alive, he wouldn't have the criminal record that he has today. *See* PSR ¶ 75. Nevertheless, the defendant moved to South Carolina with his mother four years later to another stable household, which included his mother remarrying into a loving relationship with his stepfather. *See* PSR ¶ 76.

Inherent in this contention about his grandmother and/or other family relationships being the source of his criminal conduct, is his decided lack of personal accountability for his own behavior. The defendant doesn't seem to see his own hand in the choices he has made in his life, especially now, he is no longer a child but a 31-year-old man and should feel accountable for his decisions. The Government would suggest, even with an eye to the obstacles that the defendant certainly faced growing up, that there is ample evidence to support that the defendant's path is not one defined by his upbringing.

The Government additionally asserts that the defendant's criminal history and characteristics weigh in favor of the sentence requested by the United States. The Defendant has a not insignificant prior criminal history in both South Carolina and Georgia, as well as here in Massachusetts. See ¶¶ 51 – 70. Beginning at age 17 with the defendant being charged with simple marijuana possession and escalating to prior motor vehicle offenses, larceny and burglary offenses, assaultive behavior, and ultimately to firearm and more serious drug crimes. Id. In fact, the defendant committed the current offenses while under a state sentence for "burglary" and "Grand Larceny". See id. at ¶59. Despite his developed record, the defendant has remarkably served very little actual time incarcerated on any of his state charges. Id. This concerning pattern of behavior demonstrates that there is a risk that the defendant will engage in similar behavior once released from incarceration. The defendant's behavior has escalated and even accelerated despite prior interaction and intervention from courts and the criminal justice system. The Government would suggest based on his criminal history that the defendant has been enabled by the deference provided to him by prior courts and this lack of significant consequences has emboldened him as exhibited by his commission of this brazen crime while he was still under the sentence of the state court and while he has several open warrants for serious charges in South

27

Carolina. *See id.* at ¶¶ 65 – 68. The defendant does not appear to have learned from the past nor acted with any regard for his future, and as a result he is presently a danger to the community.

### D. Need to Protect the Public

Finally, a significant sentence is also appropriate pursuant to 18 U.S.C. § 3553(a)(2)(C) to protect the public from this defendant. The defendant's conduct should cause concern for the communities of Massachusetts. By his conduct in this case, the defendant has proven himself willing and able to engage in risky and dangerous behavior by illegally possessing and providing firearms to those willing to use them. However, much more than that, he has certainly shown his reckless disregard for public safety in his willingness to continue his crimes despite his awareness of the obvious consequence or outcome of his crime, violence.  If he were unaware of the choices that he was making to put others' lives at risk, then he would not be worried about removing serial numbers from guns to make them untraceable when ultimately used and recovered by law enforcement. Furthermore, ROACHE was certainly aware that the ATF spoke to BRUNSON and warned him about giving guns to the defendant, nevertheless ROACHE continued to ask BRUNSON to buy guns for him to resell to others. His conduct is alarming, callous, and without thought for others; he should receive a 70-month sentence to afford those in his community the knowledge that concern for their safety is an important consideration.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

Here, the evidence recounted in the Judiciary Sentencing Information report (JSIN) for this defendant firmly supports a sentence of 70 months because it complies with the notion of both finding an appropriate sentence for this specific defendant and one that is not out of sync with similar defendants. The Government's recommendation is firmly in the heartland of the appropriate range by both accounts.

In reviewing data consistent with the Government's Guideline calculation from the last five fiscal years (FY2019-2023), there were 377 defendants whose primary guideline was §2K2.1, with a Final Offense Level of 25 and a Criminal History Category of IV[2], of the 376 defendants (100%) who received a sentence of imprisonment in whole or in part, the average length of imprisonment imposed was 78 month(s) and the median length of imprisonment imposed was 84 month(s).

Thus, a sentence of 70 months within these circumstances would ensure there are no unwarranted sentencing disparities, particularly if the Court were to agree with the additional sentencing enhancement requested by the Government, which would raise the ultimate offense level, as previously discussed in this memorandum.

## VII.    Additional USSG § 5K2 Factors to Consider:

USSG § 5K2.6 provides a basis of support for the Government's sentencing recommendation, which is in part based on the aggravating circumstances not otherwise considered or calculated in the guideline's offense level tabulation. In this case, "if a weapon or dangerous instrumentality was used or possessed in the commission of the offense the court may increase the sentence above the authorized guideline range. The extent of the increase ordinarily should depend on the dangerousness of the weapon, the manner in which it was used, and the extent to which its use endangered others." Here, one of the firearms purchased in September of 2023 by BRUNSON made its way to ROACHE and was used in a non-fatal shooting in Boston just 15 days after its purchase. That shooting resulted in two victims sustaining gunshot wounds. Three other guns from that same September purchase by Brunson have been recovered in

---

[2] This excludes defendants who received a §5K1.1 substantial assistance departure.

Boston, Massachusetts, on individuals who were prohibited from legally owning firearms, including a gang affiliated individual. The defendant was not only aware of the collateral cost that could theoretically result from use of these firearms (*illegally purchasing and reselling three similar make, model, and caliber firearms*) but there were actual incidents and repercussions to his actions for him to reconcile. We know that the defendant discussed with his co-conspirator the importance of covering up their crimes by removing the serial numbers from the firearms they were trafficking. ROACHE had the full knowledge that his actions helped contributed to the danger inflicted on the community.

USSG § 5K2.9 also supports the Government's recommendation where "the defendant committed the offense in order to facilitate or conceal the commission of another offense." Here, the defendant's conspiracy to purchase and then resell firearms, and specifically his efforts to illegally traffic in firearms for use in additional illicit purposes and repeatedly so, the Government contends supports its sentencing recommendation. The defendant knowingly purchased and sold multiple firearms as a prohibited person to other presumably prohibited persons. Those individuals used those firearms to commit additional crimes, in some cases within days of the firearms being purchased. At the time ROACHE was charged in this case at least eleven of the dozens of firearms purchased by BRUNSON and provided to ROACHE for him resell, were recovered by law enforcement as crime guns. *See* PSR ¶¶ 9 & 11.

Furthermore, as mentioned previously in this memorandum, the defendant discussed in text messages with his co-defendant efforts to obfuscate their illegal conduct by removing the serial numbers from their illicit firearms. The Government submits for all the reasons enumerated herein this memorandum; this is a case in which the defendant's conduct fits perfectly the definition put forth in the USSG § 5K2 policy and guidance on "criminal purpose".

30

## CONCLUSION

The defendant should be responsible for choices he has made, to do otherwise minimizes the impact that his decisions have on others and the safety of the public writ large. For all the foregoing reasons, the Government respectfully recommends that the Court impose a sentence of 70 months of imprisonment, three years of supervised release, the mandatory special assessment of 100, fines, forfeiture, and any Special Conditions the Court deems necessary. Such a sentence would be sufficient, but not greater than necessary, to reflect the seriousness of the offenses and the goals of sentencing.

Respectfully submitted,

LEAH B. FOLEY
United States Attorney

By:

LUKE A. GOLDWORM
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants .

_____
LUKE A. GOLDWORM
Assistant United States Attorney

Date: February 4, 2025